## SMITH v. AMERICAN FIRE & CASUALTY CO.

### No. 4711.

Court of Civil Appeals of Texas. Beaumont.

Sept. 13, 1951.

Rehearing Denied Oct. 4, 1951.

Adams, Browne & Sample, Beaumont, for appellant.

Orgain, Bell & Tucker, Beaumont, for appellee.

WALKER, Justice.

This action was brought upon an insurance policy, to recover the damages sustained by appellant's automobile in a collision. Appellant was plaintiff, and appellee was defendant in the trial court.

Plaintiff purchased the automobile (a new and unused vehicle) on March 22, 1949, and on the same date defendant issued to him the policy in suit. The collision occurred on June 26, 1949, during the term of the policy, and the vehicle was badly damaged. At the time of the collision the vehicle was being operated by plaintiff's brother under an agreement with the plaintiff that in a certain case the brother might buy the car from the plaintiff. Defendant plead this agreement in bar of this suit, on the ground that it brought into operation a clause of the policy which excluded the automobile from the contract of insurance if it was subject to any bailment lease, conditional sale, mortgage or other encumbrance not specifically declared and described in the policy. Defendant denied liability on the policy and plaintiff brought this suit.

The cause came on for trial before the court sitting with jury, and the jury returned the following verdict in response to special issues; (1) plaintiff was the sole owner of the automobile on March 22, 1949; (2) the automobile was damaged in a collision on or about June 26, 1949; (3) the reasonable market value of the automobile immediately prior to the collision was $1800; and (4) immediately after the collision was $985. (5) Plaintiff did not intend to pass title to his brother when he delivered the automobile to his brother; and (6) at the time of the collision, plaintiff's automobile was not subject to any *bailment lease, conditional sale,* mortgage or *other encumbrance.* The terms underlined were defined, and these definitions are repeated hereinafter.

Defendant moved for judgment non obstante veredicto. This motion brought forward the defense based on the exclusion clause to which we have referred and, in effect, was grounded upon the argument that the finding under Issue 6 was contrary to the proof as a matter of law because of the agreement by the plaintiff and his brother. We construe the motion as attacking only the finding under Issue 6; there was certainly enough evidence to support the finding under Issue 5. Defendant's motion was granted and judgment was rendered in behalf of defendant, that plaintiff take nothing. From this judgment plaintiff has appealed.

(1) The trial court erred in sustaining defendant's motion for judgment non obstante veredicto.

The provision of the policy on which defendant relies reads: "this policy does not apply: * * * (h) under coverages

* * * E * * * while the automobile is subject to any *bailment lease, conditional sale,* mortgage or *other encumbrance* not specifically declared and described in this policy." Coverage E was that sued upon by the plaintiff. In the provision describing coverage E defendant promised "to pay for direct and accidental loss of or damage to the automobile * * caused by collision of the automobile with another object or by upset * * * but only for the amount of each such loss in excess of the deductible amount * * * stated in the declarations." The deductible amount mentioned was $25.00. Coverage E was also made subject to the exclusion provision first quoted.

■ The terms used in the exclusion provision were not defined by the policy; but as we have stated the trial court, in the charge to the jury, defined the three terms underlined, and since no objection to these definitions is made by defendant these definitions fix the meaning of the terms defined and must be used in determining whether the exclusion provision ever came into operation. The trial court's definitions are quoted hereinafter.

■ Although there was evidence to the contrary of some of that now to be stated, there was proof of the following matters, and for the reasons hereinafter stated this proof supports the jury's findings under Issue 6:

Plaintiff was the sole and unconditional owner of the automobile when the policy was issued to him by defendant; and he never transferred the title of the vehicle to his brother.

The agreement on which defendant relies and which defendant says constituted a breach of the exclusion provision was oral in form and it was made after the policy was issued, in April or May.

On the date when plaintiff brought the car and when the policy was issued, the plaintiff and his wife and his brother all resided in Beaumont with the parents of the plaintiff and his brother. The brother was then 20 years old (he was of age at the time of trial) and the plaintiff was 25 years old. Shortly after the date mentioned, the brother's employment required him to work in Louisiana; and as an accommodation to his brother, the plaintiff loaned his brother the automobile and the brother took the vehicle to Louisiana and used it there for a time and then returned home with it. During his employment in Louisiana, the brother returned home at regular intervals; he was at home two weeks during each month, and his agreement with the plaintiff was made on the occasion of his second or third return to Louisiana. The cause of the agreement was the brother's need of some means of transportation to and from his place of work; the plaintiff owned another automobile and wished to aid his brother in keeping his employment. The agreement was that the brother would send to the plaintiff from time to time such money as he might save; that the plaintiff would hold this money; and that when enough money had been accumulated in this way to pay the price of the car, the brother could have the car if he wanted it. The price of the car was to be what the plaintiff "had in it" and seems to have included the cost of the policy in suit as well as the purchase price paid by the plaintiff for the car. The sums of money which the brother was to send to the plaintiff were not fixed by the agreement, nor were the times when the money was to be sent to the plaintiff.

This agreement, so far as it had any effect, remained in effect until the collision occurred in June, and the brother had the possession and made use of the automobile when he was in Louisiana. This must have been two weeks out of each four weeks since the plaintiff says his brother was at home two weeks out of each month. The brother also sent to the plaintiff about $500. As he received this money the plaintiff entered the amount of the sum received in an account book and deposited the money in his account in the bank. Plaintiff still had this money on deposit in the bank when this cause was tried.

However, neither party to this transaction considered the other party to be bound by this agreement, and each party had this fact in mind; and the jury could have

found that the parties did not intend for the brother to become the owner of the car when he had sent enough money to the plaintiff to pay the price but that the parties intended, *after* this accumulation had been made, for the brother to consciously determine that he wanted the car and for the plaintiff to consciously acquiesce in this act and thus, at that time, and not before, to vest the brother with a right to the car.

Thus the brother testified: "Q. * * * You had the right to it upon final payment, full payment, that is, of all the money he had in it, is that right? A. Unless he backed out." The plaintiff made several statements to the effect that after the brother had saved the necessary sum of money, he was to have the car "if he wanted it." And the plaintiff twice testified that a final agreement was not to be made until after the necessary sum had been saved. Thus he said: (a) "He promised me if I would sell him the car he would send me enough money or save enough *if we each would decide to make a deal he would have it* and I would let him have the car if he saved enough money;" (b) "I was going to save it for him and then if he built up enough that he could pay for the car *and wanted it* we *might make a deal.*"

With this testimony must be considered these items: (a) Both the plaintiff and his brother testified that the car was only loaned to the brother; (b) the money sent to the plaintiff was referred to by plaintiff as a "saving" for the brother and the brother testified, in effect to the same thing. Thus the brother said: "I wasn't paying it. I was just giving it to him to keep for me." Plaintiff said that he had done this service for his brother before the agreement was made; and he denied that he had applied the money on the purchase price of the car. Both plaintiff and his brother testified that the money had not been sent to the plaintiff as payments on the price of the car. Plaintiff said that the brother had no "checking account and I did". (c) The vehicle was referred to as the plaintiff's car, and when the brother was at home (two weeks out of each month) the plaintiff and his wife used the car as they wished. (d) The brother

did not have unlimited control over the car. Thus the plaintiff testified:

"Q. Now Bill, Mr. Bachman asked you yesterday, he said as far as you were concerned James could drive that car wherever he pleased, and I believe you said 'yes' to that question. Do you remember that? A. Yes sir.

"Q. Now just what were you talking about? What were you talking about? The time when he took it over there to work or when it was at home or what? A. Well, especially when he was working. * * *

"Q. Bill, do you mean by that as far as you were concerned he could take the car just any place out of say Louisiana, go to New York or Chicago or some place like that? A. No sir.

"Q. State whether or not your answer to that question was with reference to his using the car to go to work. A. Especially to be used on the job.

"Q. And incidental errands there in town, is that correct? A. That is correct."

One further item: The plaintiff testified "Q. Were you going to charge him for the use of the car while he had it over there? A. No sir."

The question before us, is whether there is any evidence to support the finding of the jury, keeping in mind the definitions given the jury; and what the preponderance of the evidence shows is immaterial. Further, if there is evidence which is subject to alternative constructions, that construction must be adopted which supports the finding of the jury.

*Bailment lease* was defined by the trial court as "the letting by the owner of a chattel to another at an agreed rental for a definite term." The jury were authorized to find that the automobile was never under a bailment lease because they could have found that the plaintiff charged no rental for the car and that the car was not let for a definite term, or, indeed, let at all.

*Conditional sale* was defined by the trial court as "the delivery of possession of a chattel at a definite price with an intent to

transfer ownership, the seller retaining the legal title to secure payment of the purchase price agreed upon." The jury were authorized to find that no conditional sale of the automobile was made because they could have found that the plaintiff never intended to transfer the ownership, beneficial or otherwise, of the automobile, and that there was no contract *to* sell and no contract *of* sale but, instead, only an executory agreement which did not amount to a contract.

Obviously, under the proof stated, there was no mortgage on the car and we do not understand that defendant contends otherwise.

*Other encumbrance* was defined by the trial court as: "a right, title or interest in a chattel placed in another by the owner with the intent to diminish the *owner's right* to control and disposition of the chattel." The term *owner's right* evidently refers to a right which is enforcible at law, and the definition does not include a moral right which falls short of a legal right. However, under the proof stated, it is not necessary to place this limitation upon the trial court's definition. For this proof authorized the jury to find that the plaintiff and his brother never intended the agreement to diminish the plaintiff's legal or moral right to control and dispose of the automobile. It may be that there is evidence to the contrary; but as we have stated, the question is whether there is any evidence which will support the finding of the jury.

■ The proof stated supports a finding that the plaintiff's brother was only bailee of the vehicle under a bailment made solely for the brother's benefit. Under such a bailment the plaintiff had the ownership and the right to have the automobile on demand; and no rights in the brother's behalf enforcible by the law were created by the agreement except in and to the deposit of money in the plaintiff's hands. Defendant does not contend that a simple bailment is an encumbrance within the meaning of the exclusion clause quoted above.

The decisions cited by the defendant are not in point on the facts. In London Assurance Corporation v. Dean, Tex.Civ. App., 281 S.W. 624, 625, the parties had a definite agreement to purchase and sell, which was partly executed by delivery of the automobile to the buyer and by a part payment of the price to the seller. The court referred to this and said: "This was a complete change of the interest which defendant in error had in the car"; and held, in effect, that the parties' failure to comply with the statute requiring a bill of sale had left the seller without a remedy on the contract or to recover possession of the vehicle. Otherwise, there would have been a contract (instead of an agreement); but the proof made in the case at bar support a finding that plaintiff and his brother made no contract, of purchase and sale or otherwise. The legal consequences of the seller's delivery of possession to one from whom he could not recover it is not in the case at bar. The discussion of *conditional sale* in the cited case is also bottomed upon a finding that a contract (as distinguished from an agreement) had been made. There was a similar definite agreement to purchase and sell in Fire Association v. Perry, Tex.Civ.App., 185 S.W. 374, and we note that on page 377 the court said: "* * * that, had the property not been destroyed, L. E. Perry could have carried out his part of the agreement between himself and his sisters and have become the sole owner of the property". It was the opinion of the court that although the agreement may not have been fully enforcible before Perry completely performed it (because of some agreements regarding the personal conduct of L. E. Perry) nevertheless, had he complied with it he would have become the owner of the property upon the completion of his performance. Such a result would not have followed here; for the jury could have found that the delivery of the full price to the plaintiff by his brother would not have given the brother a right to have the car from the plaintiff.

It seems to us that the transaction by the plaintiff and his brother actually did not tend to diminish the plaintiff's desire or

wish to protect his car and that the only injury to the defendant which this transaction might have caused was such an injury as would have resulted from a bailment by the plaintiff to another for use by the other. Indeed, the plaintiff testified:

"Q. You all had an agreement about the car. I haven't asked about the details, but you had a specific agreement when he took the car over there? A. That he would take care of the car like I had.

"Q. You wanted him to take care of the car? A. Yes, sir."

As we have stated, defendant does not contend that such a bailment brings the exclusion clause into operation but we think that under the definitions given by the trial court such a contention could not be sustained.

■■ (2) Defendant has also filed one Point of Error for reversal, assigning error to the submission of Issues 3 and 4 Under these issues the jury found the market value of plaintiff's automobile immediately before and after the collision; and according to these findings, plaintiff's loss was $815. This loss is simply the decrease in the market value of the car, and the Point of Error for reversal is grounded upon the argument that defendant was not liable for the loss in market value but was liable only for what it would have cost to repair the automobile with parts of like kind and quality as the parts damaged. The argument is based upon the following provision of the policy: "The limit of the company's liability for loss shall not exceed the actual cash value of the automobile, or if the loss is of a part thereof the actual cash value of such part at time of loss *nor what it would then cost to repair or replace the automobile or such part thereof with other of like kind and quality,* with deduction for depreciation, nor the applicable limit of liability stated in the declarations."

Defendant makes no other objection to the measure of damages submitted in Issues 3 and 4.

The vehicle was badly damaged, but the damage did not amount to a total loss of the vehicle. After the defendant denied liability, plaintiff caused repairs to be made to the vehicle, and the person who supervised and was familiar with these repairs testified that the repairs made were necessary and that the price charged therefor was reasonable. The repairs cost $615.38. He also testified that he used new parts to make the repairs. It is also to be inferred from his testimony that the repairs made were thought by him to be complete and to constitute such repairs as could have been made.

We also construe the testimony of this witness as showing that these repairs did not restore the vehicle to the market value which it had immediately prior to the collision. This was a consequence of the great damage done to the vehicle. The witness seems to say that a dealer who purchased the vehicle for resale would expect to sell the vehicle for a sum materially less (from $200 to $300) than he would expect to get for a similar car which had not been damaged.

The vehicle was about three months old and had been driven for a distance of between 6,000 and 7,000 miles at the time of the collision; and because of the shortage of automobiles was thought by the repairman to have a market value at the time of the collision of $1800 and the jury so found under Issue 3. This sum was only $87.00 less than the price paid for the car by the plaintiff who bought it as a new car. The plaintiff's brother testified that the car was in good condition prior to the collision. There is no other evidence indicating whether the new parts used were of like kind and quality as the parts which were damaged, and there is no evidence as to whether secondhand parts of like kind and quality as the damaged parts could have been obtained, or concerning the cost of secondhand parts.

The Point of Error for reversal is overruled. The meaning of the words *repair* and *replace* which are used in the policy includes a restoration of the automobile to substantially the same condition in which it was immediately prior to the collision,

454

and it would not be restored to this condition if the repairs left the market value of the repaired vehicle substantially less than the market value immediately before the collision. According to the evidence, repairs made with new parts did not accomplish this result, and obviously (if defendant means to say that secondhand parts ought to have been used, if available) the use of secondhand parts would not have done more. Thus, under the proof, the limitation of liability relied on by defendant never came into operation. In Standard Accident Insur. Co. v. Richmond, Tex. Civ.App., 297 S.W. 879, 880, the court said: "Appellant contends that it was only required to pay the cost of restoring the car to substantially the same condition it was in before the injury. That is true, if the words 'substantially the same' mean a condition which made the car equal in value to what it was before the injury." And on the point at issue see: Automobile Underwriters v. Radford, Tex.Civ.App., 293 S.W. 869, 299 S.W. 852; Home Insurance Co. v. Ketchey, Tex.Civ.App., 45 S.W.2d 350; Bankers & Shippers Insur. Co. v. Ellis Green Motor Co., Tex.Civ.App., 102 S.W.2d 294; Higgins v. Standard Lloyds, Tex.Civ.App., 149 S.W.2d 143. And also see: Stoops v. First Amer. Fire Insur. Co., 160 Tenn. 239, 22 S.W.2d 1038; Weems v. Service Fire Insur. Co., 181 Tenn. 1, 178 S.W.2d 377; Rossier v. Union Automobile Insur. Co., 134 Or. 211, 291 P. 498; Dunmire Motor Co. v. Oregon Mutual Fire Insur. Co., 166 Or. 690, 114 P.2d 1005; Ciresi v. Globe & Rutgers Fire Insur. Co., 187 Minn. 145, 244 N.W. 688.

These comments adjudicate the parties' contentions. The judgment of the trial court must be reversed and judgment here rendered for plaintiff for the sum of $815. As regards interest, the decision in Texas Power Corp. v. Kuehler, Tex.Com. App., 52 S.W.2d 76, is applicable to the petition; and interest on the $815 at the legal rate will therefore be awarded from the date of the trial court's judgment. Houston Gas & Fuel Co. v. Perry, 127 Tex. 102, 79 S.W.2d 623, 91 S.W.2d 1052.

Judgment is rendered as stated.